# EXHIBIT A

*Pittsburgh Post-Gazette (Pennsylvania) March 17, 2005 Thursday*

Copyright 2005 P.G. Publishing Co.
Pittsburgh Post-Gazette (Pennsylvania)

March 17, 2005 Thursday SOONER EDITION

**SECTION:** LOCAL, Pg.B-1

**LENGTH:** 693 words

**HEADLINE:** JURY FIXING HINTED IN MISTRIAL;
TWO OF 12 JURORS REFUSED TO FIND ACCUSED DRUG RINGLEADER GUILTY

**BYLINE:** TORSTEN OVE, PITTSBURGH POST-GAZETTE

**BODY:**
Federal agents and prosecutors are looking into possible jury tampering after a mistrial was declared this week in the month-long trial of accused cocaine kingpin Terrance Larnell Cole.

The jury convicted one man, Kevin Gray, 43, of Duquesne, on drug distribution charges.

But it deadlocked on Cole, 36, a Hazelwood native living in Penn Hills who is reputed to be boss of the largest drug ring ever prosecuted in Western Pennsylvania.

Ten jurors wanted to convict.

But two, Joseph Olasin, 49, of Apollo, and Kevin Lewis, 28, of Homestead, refused, forcing U.S. District Judge Thomas Hardiman to declare a mistrial Monday after 22 hours of deliberations.

Olasin didn't return a message yesterday, and Lewis couldn't be reached.

But several jurors said Olasin repeatedly warned them that they would be in danger if they convicted Cole, who according to court papers has a history of threatening witnesses or paying them off.

"He told us that if we found these people guilty, all our lives will be in jeopardy, our families would be in danger and our homes would burn," said one juror, Bernard Mulash, 72, of Ross.

When other jurors questioned him about what he meant, Olasin, an Allegheny County Port Authority mechanic, didn't provide any reasons other than his street smarts as a former strip-club owner and state constable.

Jury foreman Gretchen McKay, 44, a Pittsburgh Post-Gazette reporter from Ben Avon, said Olasin told jurors that Cole was guilty but "too smart" for them.

She also said both he and Lewis refused to deliberate.

Lewis caused a stir after closing arguments last week when IRS Agent John Q. DiLucente, one of the government's lead investigators, complained that he winked at Cole.

In a note to the judge, however, Lewis explained that "my left eye was messing with me and the agents thought I made a pass" to Cole. Hardiman didn't take any action, nor did Assistant U.S. Attorney Gregory Nescott, who tried the case.

Some jurors and others in the courthouse also said they had heard that Lewis waved to Cole's supporters in the gallery and had held his fist to his chest when he saw them in the cafeteria.

One male juror even asked Lewis: "How much are you getting?"

Lewis angrily denied the accusation and the two men argued.

In his note to the judge, Lewis said he was abiding by his oath to be fair. In another, he complained that other jurors were "putting words in my mouth."

"Just get somebody else," he wrote. "I don't want to do this anymore."

McKay also said Lewis and Olasin would not follow Hardiman's instructions.

She said Olasin, for example, refused to consider circumstantial evidence, even though the law gives circumstantial and direct evidence equal weight.

He also told other jurors that he had visited some of the sites mentioned in the trial, a direct violation of the judge's orders.

Olasin told Hardiman, however, that he just happened to be driving by the properties.

The U.S. attorney's office plans to retry Cole, probably in May, but U.S. Attorney Mary Beth Buchanan would not comment on whether prosecutors are examining the trial for misconduct.

Cole is accused of shipping two tons of cocaine worth $40 million into Pittsburgh from 1991 to 2003.

Imprisoned Dominican drug lord Miguel Duran, 38, of New York City, testified that his couriers traveled regularly to Pittsburgh with cocaine shipments hidden in false gas tanks and other secret compartments he had installed in his fleet of cars.

He said Cole and his top lieutenant, Thomas "Fat Tommy" Gilliam, picked up the shipments at the Palace Inn in Monroeville and unloaded them at Cole's sister's house in Hazelwood and later at his mother's secluded Penn Hills home.

Court records and testimony indicated that Cole used drug money to buy 17 properties worth more than $1 million through his real estate company, T.C. Development of Forest Hills.

IRS agents say he also masked his drug income by either converting it into casino checks from gambling splurges in Atlantic City, N.J., and Las Vegas, or by buying other people's winning lottery tickets in Hazelwood.

**NOTES:**
Torsten Ove can be reached at tove@post-gazette.com or 412-263-2620.

**LOAD-DATE:** March 17, 2005

# EXHIBIT B

*Pittsburgh Post-Gazette (Pennsylvania) March 18, 2005 Friday*

Copyright 2005 P.G. Publishing Co.
Pittsburgh Post-Gazette (Pennsylvania)

March 18, 2005 Friday SOONER EDITION

**SECTION:** LOCAL, Pg.B-1

**LENGTH:** 822 words

**HEADLINE:** DRUG CASE JUROR DENIES MISCONDUCT;
HOLDOUT SAYS GOVERNMENT'S WITNESSES LACKED CREDIBILITY

**BYLINE:** TORSTEN OVE, PITTSBURGH POST-GAZETTE

**BODY:**
One of two jurors who caused a mistrial this week when he refused to convict accused cocaine kingpin Terrance Larnell Cole denied he was paid or otherwise influenced to hold out.

"Absolutely not," said Joseph Olasin, 49, of Apollo, when asked yesterday about possible jury tampering. "My reasons for not convicting were that I did not like the credibility of the witnesses."

Federal prosecutors are examining the possibility that Cole or someone he knows may have influenced Olasin or a second juror, Kevin Lewis, 28, of Homestead, who also refused to convict.

Lewis, who denied an accusation that he winked at Cole after closing arguments, couldn't be reached for comment.

Olasin said that Cole was probably guilty, but the government didn't prove it.

"This investigation had been going on since 1991 and I feel that the government could've gotten a little more," he said. "I can't go with just my belief [that he is guilty]. I have to go with the evidence. The credibility of the government's witnesses [was lacking]."

Olasin said the witnesses were mostly drug dealers who cut deals with prosecutors.

After a monthlong trial, a jury did convict Kevin Gray, 43, of Duquesne, on drug distribution charges but deadlocked Monday on Cole.

Ten jurors wanted to convict Cole, but Olasin and Lewis did not, forcing U.S. District Judge Thomas Hardiman to declare a mistrial after 22 hours of deliberations.

Several jurors said Olasin warned them that they would be in danger if they convicted Cole. Bernard Malush, 72, of Ross, said Olasin told them "our lives will be in jeopardy, our families would be in danger and our homes would burn."

But Olasin said his comments were misinterpreted. What he told them, he said yesterday, was that they had to be careful not to convict an innocent man. An innocent man wrongly convicted, he said he told them, will send someone to find those responsible.

Jury foreman Gretchen McKay, 44, a Pittsburgh Post-Gazette reporter from Ben Avon, said Olasin also told jurors that Cole was guilty but "too smart" for them.

She and others said he and Lewis refused to deliberate.

"We very thoughtfully went through our reasons for why we believed a piece of evidence or didn't believe a piece of evidence, or why we believed a certain witness or didn't believe the witness. His [attitude] was just, 'Show me the evidence,' " she said of Olasin.

Another juror, Stewart Moyers, 49, of Irwin, said Olasin accused the others of not being "street smart" and clashed with McKay from the moment she was elected foreman.

He also said Lewis, in particular, would not deliberate at all, saying only that Cole was not guilty and "that's all I want to say."

"I gave up early in the deliberations," said Moyers, a construction superintendent. "I recognized that there was nothing we could say that was going to convince them. The first day I was frustrated beyond belief."

Lewis had caused a commotion after closing arguments in the trial when an IRS agent complained that he winked at Cole. In a note to the judge, however, Lewis explained that "my left eye was messing with me."

Moyers said Lewis' refusal to discuss the evidence made him suspicious enough to ask: "Did they get to you?"

He said Lewis got angry and said, "I can't believe you said that."

But after he raised the question, Moyers said, another juror stood up and said, "You know, I kind of want to know that, too."

"There was nothing that was going to change his mind," said Moyers. "And it was right at the beginning. That is what was so odd."

Lewis told the judge that he was abiding by his oath to be fair and complained that other jurors were making him mad and "putting words in my mouth."

Yesterday, Cole's sister, Sandra Cole, and girlfriend, Theresa Harber, said neither Cole nor his family and friends knew Lewis. They also said Cole never threatened or bribed anyone on the jury.

During deliberations, jurors had also complained that Lewis and Olasin would not follow Hardiman's instructions.

McKay and Moyers said Olasin, for example, refused to consider circumstantial evidence and told jurors that he visited some of the sites mentioned in the trial.

Olasin said yesterday that he did drive near one of the properties in the east suburbs while looking at houses to buy, but when he realized where he was, he left.

"I told my girlfriend, 'Let's get out of here,' " he said.

Cole's lawyer, Gary Zimmerman, declined comment on the mistrial, but Sandra Cole and Harber suggested that federal agents are looking at the jury's conduct merely because the government didn't win its case.

The U.S. attorney's office hopes to retry Cole in May, but U.S. Attorney Mary Beth Buchanan will not comment on whether prosecutors are examining the circumstances of the mistrial.

Cole is accused of shipping 2 tons of cocaine worth $40 million into Pittsburgh from 1991 to 2003.

**NOTES:**
Torsten Ove can be reached at [tove@post-gazette.com](mailto:tove@post-gazette.com) or 412-263-2620.

**LOAD-DATE:** March 19, 2005

# EXHIBIT C

*Defense to probe leak to reporter Pittsburgh Tribune Review March 19, 2005 Saturday*

Copyright 2005 Tribune Review Publishing Company
All Rights Reserved
Pittsburgh Tribune Review

March 19, 2005 Saturday

**LENGTH:** 689 words

**HEADLINE:** Defense to probe leak to reporter

**BYLINE:** Chris Osher

**BODY:**

The lawyer for accused drug kingpin Terrance Cole said he plans to file court papers charging the local U.S. Attorney's Office with prosecutorial misconduct for having told a newspaper reporter that it plans to investigate whether jury tampering occurred in Cole's case.

Cole's trial on federal charges of conspiracy to distribute cocaine and conspiracy to launder money ended Monday with a deadlocked jury. Prosecutors intend to retry him.

"It distresses me that the government would put out to the media that they are investigating jurors because they didn't agree with the government," said defense lawyer Gary Zimmerman. "It sends a chilling message."

Zimmerman said his motion will seek to have the charges against Cole dismissed for prosecutorial misconduct.

Cole, 36, of Penn Hills, faces up to life in prison if convicted in a second trial.

"I just think it says that if you are on the next Terrance Cole jury and you don't find him guilty, we're going to investigate you," Zimmerman said. "That's wrong. It's completely contrary to our jury system."

Prosecutors are barred from even acknowledging the existence of investigations.

Zimmerman said he wants to determine who told a Pittsburgh Post-Gazette reporter that prosecutors plan to investigate the possibility that Cole or someone he knows might have influenced two jurors who refused to convict Cole.

U.S. Attorney Mary Beth Buchanan declined yesterday to respond to Zimmerman's statements. She said her office will respond in court after he has filed his motion.

Buchanan said she didn't tell anyone in the media about whether her office plans to investigate possible jury tampering. She added that she is confident that nobody in her

office had spoken about the matter. She declined yesterday to confirm the existence of such an investigation.

After a monthlong trial, U.S. District Judge Thomas Hardiman declared a mistrial in Cole's case after 22 hours of jury deliberations. The jury announced it was deadlocked; two jurors have said they didn't believe there was enough evidence to convict.

An investigator in the case said he saw one of the jurors, Kevin Lewis, 28, of Homestead, wink at Cole. Lewis denied the allegation and said he had eye problems.

Jurors who wanted to convict Cole said another juror, Joseph Olasin, 49, of Apollo, Armstrong County, told them their lives would be in jeopardy if they convicted Cole.

The jury did convict co-defendant Kevin Gray, 43, of Duquesne, on drug-distribution charges.

Zimmerman, the defense attorney, has been especially critical of the questions raised about Lewis. After closing arguments in the trial, Assistant U.S. Attorney Greg Nescott told Hardiman that juror Lewis was seen waving to someone in the gallery.

"If that would have been a white kid from Mt. Lebanon, nobody would have thought anything of it," Zimmerman said. "I think the government is just stomping their feet because they didn't get their way."

Lewis could not be reached for comment yesterday.

Olasin, a mechanic for the Port Authority of Allegheny County, said his comments were misconstrued. He said he never told the other jurors they would be in danger if they convicted Cole. He said he told them that if they convicted an innocent man, they needed to be aware that that man could come looking for them.

"I think somebody is making a mountain out of a mole hill," Olasin said.

Olasin also denied that he had driven by some of the properties discussed in the case, which the judge had instructed the jurors not to do. He said he was looking at houses for sale with his girlfriend. Olasin said that when he realized he was coming into the area mentioned in the trial, he told his girlfriend to leave the area.

Prosecutors have said Cole headed a drug ring from Hazelwood, his original neighborhood, that brought 2 tons of cocaine worth $40 million to the Pittsburgh area from 1991 to 2003.

Miguel Duran, 38, of New York City, testified that he supplied the cocaine to Cole, who distributed it throughout Western Pennsylvania. Duran testified that Cole was such a valued customer, he gave him a diamond-studded Rolex watch worth $25,000.

**LOAD-DATE:** March 19, 2005

# EXHIBIT D

*Trial by jury Pittsburgh Tribune Review March 27, 2005 Sunday*

Copyright 2005 Tribune Review Publishing Company

All Rights Reserved
Pittsburgh Tribune Review

March 27, 2005 Sunday

**LENGTH:** 949 words

**HEADLINE:** Trial by jury

**BYLINE:** Joseph Sabino Mistick

**BODY:**

"Twelve Angry Men," the great play and movie, teaches us that one stubborn hold-out juror can deliver more justice than any collection of jurors that enters into deliberation filled with certitude.

The protagonist -- who is played unforgettably by Henry Fonda and serves as Juror No. 8 -- digs in his reasonably doubtful heels regarding the innocence of a young Hispanic defendant after the first vote of the jury is 11-1 for conviction.

At first, Juror No. 8 plays the contrarian. He begins to argue for the sake of argument. After all, the kid will be sentenced to death if convicted, and Juror No. 8 figures that a little discussion won't hurt.

Over the hours, the hopes and fears and values of the jurors spill out until, at the end, they all switch their votes to acquittal. The jury system has worked and resulted in a tidy ending.

As we have seen in the Pittsburgh federal trial of Terrance Cole for conspiracy to distribute cocaine and launder money, it is often a bit messier than that in the real world.

Two jurors refused to vote to convict, resulting in a "hung jury." This happens from time to time. But in this case, the jury foreperson went public with her concerns that one of these minority jurors may have voted to acquit for less than legitimate reasons.

Proper perspective

An examination of the nature of government and the role of juries may put these suspicions in their proper place. Our laws are passed by legislators who are charged with translating our collective will into statutes and ordinances. The president of the United States is actually chosen by electors and not directly chosen by the American people. And even our judges -- elected and appointed virtually for life -- hold special positions in society.

But a jury is the purest form of democracy; it's where average citizens can get some democratic traction. It is the only direct involvement of citizens in the business of governing. There is no other institution that permits the citizenry to tell the government where to get off -- with finality. Jurors provide that indispensable buffer between accused citizens and those other institutions that we have chosen to govern us.

While serving as a juror, you are omnipotent in the matter before you. You may conclude that the government did not prove the defendant's guilt beyond a reasonable doubt. You may vote for acquittal simply because something did not feel right. You may resist the

prosecutor's importuning for reasons that you and only you know for sure.

Sometimes a juror votes for acquittal to settle a score on some perceived social injustice that has little or nothing to do with the case at hand. It may be a simple distrust of authority or a protest against an unpopular law.

And some jury decisions seem far-fetched at best by those observers who are not privy to the private thoughts and deliberations of jurors. In this regard, the O.J. Simpson and Robert Blake verdicts will remain baffling to many.

Jury nullification -- the de facto ability to acquit a defendant in spite of the evidence against him -- is the 300-pound gorilla in the corner of the room. Everybody in the business of justice knows that it's there, but nobody wants to acknowledge it. In fact, just talking about it makes prosecutors, judges and scholars squirm.

'Vital cogs'

But the sanctity of juries and the right of all jurors to vote as they choose remain vital cogs in the American machine of justice. As Duquesne University law professor Bruce A. Antkowiak points out in his 2003 Widener Law Journal article, the inviolable role of the jury system has been cited in every important legal document in our nation's legal history: the Magna Carta, the Declaration of Independence, all state constitutions that were enacted between 1776 and 1787, the body of the Constitution and three of the first eight amendments.

While most citizens easily recognize the three traditional branches of government, Antkowiak argues that the stability of our entire system relies on the existence of four distinct branches. In addition to the executive, legislative and judicial branches, he cites the jury as a fourth entity that is essential to the entire process.

Blackstone, the great 18th century legal philosopher, called the right to a trial by jury the sine qua non of freedom. The Founding Fathers took much of Blackstone's legal framework and made it our own, much of it in our Bill of Rights.

In a 1991 Yale Law Journal article, professor Akhil Reed Amar put it succinctly. Jurors chosen from the general community are like militiamen -- not permanent employees beholden to the government for their livelihood. And just as the militia was to serve as a check on the professional army, juries composed of average citizens "thwart overreaching by powerful and ambitious government officials."

So, what does this say about the two jurors who voted for acquittal and hung the jury in the Terrance Cole case?

We may never know why they voted as they did; in fact, we are not entitled to know that. But the real damage to our system of justice may result from the fact that someone told a reporter that the two hold-out jurors were now being investigated for jury tampering.

Gary Zimmerman, Cole's lawyer and a veteran criminal defense attorney who still has fire in his belly, wants you to ask yourself this: How likely would you be to serve on a jury and be a hold-out for acquittal if you knew that it would subject you to an investigation by the FBI?

Zimmerman says that it all reminds him of a take-off on that well-known line from Janis Joplin's hit "Me & Bobby McGee." "Pretty soon," he says, "freedom will be just another word

-- and we will have nothing left to lose."

**LOAD-DATE:** March 27, 2005